IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 2, 2021

## IN RE DOMINIC B.

**Appeal from the Juvenile Court for Knox County**
**No. 178100   Timothy E. Irwin, Judge**

———————————————————————

### No. E2020-01102-COA-R3-PT

———————————————————————

This is an appeal from a termination of parental rights case. The trial court determined that three grounds for termination had been established as to the child's mother: abandonment by failure to establish a suitable home pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(ii), persistence of conditions pursuant to Tennessee Code Annotated section 36-1-113(g)(3), and failure to manifest an ability and willingness to assume custody pursuant to Tennessee Code Annotated section 36-1-113(g)(14).  The court further determined that the termination of the mother's parental rights was in the child's best interests.  Although we vacate two of the termination grounds due to insufficient findings, we affirm the trial court's conclusion that there is clear and convincing evidence to support its finding of abandonment and its determination that the termination of the mother's rights is in the child's best interests.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in Part, Affirmed in Part and Remanded.**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which ANDY D. BENNETT and JOHN W. MCCLARTY, JJ., joined.

Anna East Corcoran, Knoxville, Tennessee, for the appellant, Eva B.

Herbert H. Slattery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

### BACKGROUND AND PROCEDURAL HISTORY

The Appellant Eva B. ("Mother") is the mother of Dominic B. ("Dominic"), the

child who is the subject of this appeal.[1]  Dominic, who was born in May 2013, was removed from Mother's care in October 2018 as a result of Mother's mental health issues and environmental neglect.  In a petition requesting that the Knox County Juvenile Court ("the Juvenile Court") find Dominic to be dependent and neglected, the Department of Children's Services ("the Department") alleged in pertinent part as follows:

1.  Dominic . . . is dependent and neglected . . . because of the mother's mental health issues.  The Department received a report of harm on July 9 2018, with allegations of environmental neglect.  The report alleged that the family did not have power in their home.  It also alleged that the mother constantly yelled profanity at the child and that she does not take her psychological medication appropriately.

2.  The case was originally assigned to CPSA Lucas Lawson.  Throughout July and August, CPSA Lawson assisted the family with locating resources to pay for electricity in the home and enrolling the child into Karns Elementary.  The mother was also provided two monthly bus passes.

3.  The case was transferred to CPSA Copeland on September 30, 2018.  CPSA Copeland made multiple attempts to schedule home visits with the parents but was unable to get cooperation from the mother.  CPSA Copeland went to the child's school on October 16, 2018.  The child's teacher reported that Dominic is frequently absent because the mother oversleeps and does not get him to school.  The child is reportedly behind in school and struggles with his pencil grip.  The school social worker [Ms. Courtney] has provided the child with all of his school supplies.  The child is also lacking in social and verbal skills.

4.  [Ms. Courtney] reported that the child has 13 unexcused absences for the year.  Ms. Courtney reported that the family has been without power since June.  Ms. Courtney reported that she had been to the family home twice and that the family appeared to have "just gotten up" both times she went.

5.  CPSA Copeland contacted Pam Tice on October 16, 2018.  Ms. Tice has previously been a resource for the family and has kept the child in the past.  She [reported] that the mother "spews toxic words" at the child when she is not taking her medication.  She reported that the mother has ongoing problems with her electricity and that she and her parents have assisted the mother with finances in the past.  She reported that the mother has been clinically depressed since the maternal grandmother passed away in 2010.  She reported that the mother has been unable to keep a job due to her mental health and has been homeless at times because of this.  Ms. Tice stated that the child's half-brother . . . would be a resource for the child but that he does not get along with the mother.

---

[1] This Court has a policy of protecting children's identities in parental termination cases by initializing the last names of the parties.

6. CPSA Copeland contacted . . . the child's sister-in-law . . . on October 16, 2018. She reported that they have had concerns about Dominic since he was born. She reported that they have kept him on multiple occasions. She reported that they would be willing to serve as a placement for Dominic.

7. CPSA Copeland spoke to the mother on October 16, 2018. She reported that she is behind on both her electricity bill and her rent. The mother reported that her only income is food stamps. The mother reported that she has clinical depression as well as anxiety but that she has not had access to her medication for a "few months." She reported that this makes it difficult for her to leave her home.

. . . .

9. The child was placed with his half-brother and sister-in-law . . . through an immediate protection agreement. The have elected [to] become kinship foster parents for the child.

The Juvenile Court entered a "Protective Custody Order" on October 25, 2018, wherein it found there to be probable cause that Dominic was dependent and neglected, determined reasonable efforts had been made to prevent his removal, and awarded temporary legal custody to the Department. Later, on January 16, 2019, the Juvenile Court found Dominic to be dependent and neglected.

The primary issues in this case related to Mother's mental health and housing situation, and after Dominic was removed, several permanency plans were created with the aim of addressing these and other concerns. In the first permanency plan, created on November 13, 2018, Mother was required to, among other things, complete a mental health assessment and follow all treatment recommendations, take medications as prescribed and cooperate with pill counts, obtain and maintain housing with working utilities, complete parenting classes, obtain and maintain a legal source of income and provide proof of income to the Department, demonstrate parenting skills during visitations with the child, be on time to visitations, comply with all court orders, maintain contact with the Department case manager at least twice a month, notify the Department of any changes in her circumstances, sign any release of information forms as required, not incur new charges, and resolve any pending legal matters. The requirements of Mother remained essentially the same under subsequent permanency plans.

On January 3, 2020, the Department filed its "Petition to Terminate Parental Rights" in the Juvenile Court, requesting that Mother's parental rights to Dominic be terminated on the following grounds: (1) abandonment through failure to provide a suitable home, (2) substantial noncompliance with permanency plan, (3) persistent conditions, and (4) failure to manifest an ability and willingness to assume custody. The petition further averred that

- 3 -

termination of Mother's parental rights was in Dominic's best interests, claiming, among other things, that Mother had not made changes in her conduct or circumstances and was not in compliance with her mental health treatment recommendations. Additionally, the petition alleged that Dominic had established a strong bond with his foster parents, who wished to adopt him.

A trial on the Department's petition occurred on July 23, 2020. The proof consisted of live witnesses, as well as numerous documentary exhibits. Evidence was offered on various areas of Mother's life, particularly concerning her housing situation, employment prospects, and mental health. At the time of trial, Mother had pending charges for burglary and shoplifting. She testified that she had been working at McDonald's for about three weeks prior to trial and stated that she previously had a job at Hardee's but had to find another job once that restaurant closed. Regarding other employment she claimed to have had held at times since October 2018, Mother testified as follows:

> I know there's one place called Krispy Kreme, I was working for them. And then after that I applied at another McDonald's last year, and I worked there for six months last year. And I did a job -- I did some work through one of the employment services called Resource, and then got this job here recently. And I was doing a little part-time job, it was a temp job, but it was working for Liberty Tax. It was a temporary job because it was only seasonal.

Whereas Mother recalled at trial that she left her prior job at Krispy Kreme voluntarily, Deidre West, a foster care worker for Dominic for much of the case,[2] claimed that Mother had previously reported to have been terminated from Krispy Kreme due to a tardiness issue. Laura Griffin, a family services worker assigned to the case since December 13, 2019, stated that she had not been given proof of employment.

As for her housing situation, Mother testified that she had been living at KARM[3] since the end of January and, before that, at the Salvation Army. She asserted that she had started living at the Salvation Army in August 2019, and before that time, she had lived at the Autumn Landing apartment complex. According to Ms. West, Mother's housing at Autumn Landing did not have power "for the majority of the time." Ms. West's testimony further indicated that Mother had been evicted from Autumn Landing due to housekeeping issues.

---

[2] Ms. West was a foster care worker for Dominic between his October 2018 removal and June 4, 2019, and then again from October 2, 2019 until December 13, 2019. Ms. West had to initially stop working on the case in June 2019 when she went on maternity leave.

[3] As the Department notes in its brief, and as we have noted in previous cases, *see, e.g.*, *In re Crystal W.*, No. E2020-00617-COA-R3-JV, 2021 WL 214823, at *2 (Tenn. Ct. App. Jan. 21, 2021), KARM stands for "Knox Area Rescue Ministries."

Mother's physical housing situation at the time of trial was no more amenable to a life with Dominic than it had been at the time of his removal. Indeed, Mother testified that Dominic could not stay with her at KARM, and she acknowledged that her lack of appropriate housing was one of the reasons Dominic had been removed. Concerning her efforts to find housing, Mother testified that she had previously applied for HUD housing and had also applied for housing through "KCDC,"[4] however, she was not approved. Mother seemed to attribute some blame to the Department for her failure to secure appropriate housing in the nearly two years since the child's removal, and when asked if the Department had given her information incident to Dominic's removal about "where to find providers, where to find housing, et cetera," Mother answered in the negative, stating, "They can say they have, but they have not." Ms. West, by contrast, specifically testified that she gave Mother a resource guide in November 2018. According to her, Mother had no questions about it. Regarding evidence of Mother's future intentions with regard to housing, a letter dated July 6, 2020 was introduced at trial wherein a case manager for the Helen Ross McNabb Center's PATH[5] program stated that Mother would be applying to the Center's Pleasantree Apartments, which was for single mothers.

On top of the concerns that existed as to Mother's physical housing were those about Mother's mental health. Mother testified that she believed she had been diagnosed with depression and anxiety before Dominic was ever born, and at trial, she testified that she was on medications for depression, anxiety, and sleep disorder. Records introduced as exhibits at trial confirmed diagnoses for generalized anxiety disorder, panic disorder, and moderate recurrent major depression. Whereas the results of Mother's mental health assessment included recommendations for individual outpatient therapy, a psychiatric evaluation, medication management, and homemaker skills, Mother had not fulfilled all of these recommendations by trial. According to Ms. West, she had not been aware of Mother attending therapy while she had the case. She further testified that Mother had not been compliant with her medication management. Ms. Griffin also testified that she was not aware that Mother had completed therapy.

Mother testified that she goes to Cherokee for therapy and gets medicine prescribed through the McNabb Center. She stated that she had done therapy a couple of times in the few months before trial. Paperwork introduced at trial from the "Knox County Adult Clinic," where Mother testified she had received medication, showed that Mother's services were cancelled in July 2019 due to her noncompliance and that she had "canceled/no showed" to nine appointments. According to Mother, however, she had been compliant with her medication since February 2020.

Although Mother testified that she wanted to get a psychiatric evaluation, she

---

[4] As noted in the Department's brief, KCDC stands for Knoxville's Community Development Corporation.

[5] Project for Assistance in Transitioning from Homelessness ("PATH").

described her claimed difficulty in securing one. Ms. West testified that Mother had never informed her that she had any issue with contacting providers or setting up evaluations, and Ms. Griffin testified that she gave Mother a list of providers but stated that Mother did not reach out and ask for resources regarding a psychiatrist until the day after there was a permanency hearing on the case.

Proof was also offered about the relationship Mother and Dominic had exercised in visitations, as well as concerning the relationships Dominic had with members of his foster family. Regarding her visits with the child, Mother testified that the last few visits had been "fine" but "not . . . easy" because they had been by video.[6] Mother acknowledged, however, that there had been "issues" with the visits that occurred before video visitation. Ms. West testified that visitations between Mother and Dominic would "start out well" but that Mother would "tend to get upset frequently with Dominic" and walked out on several occasions. According to Ms. West, one visitation ended with Dominic in tears because Mother had knocked down some blocks that Dominic had built up for a house. Ms. West testified that Mother had missed one visit and was frequently late for visits. Although Ms. West acknowledged that Mother had completed parenting classes, she further stated that Mother had not learned to interact with Dominic appropriately and demonstrate that in visitations. For her part, although Mother testified that she knew she "can't keep [Dominic] right now," she stated that she loved him and would like a chance to raise him.

The child's foster mother ("Foster Mother") testified that Dominic was doing well and had gone "from being just this boy that was just in his own little bubble to you can't get him to be quiet." She testified that Dominic got along well with her other children, and she indicated a desire to adopt Dominic if he were to become available for adoption. Foster Mother testified that she and her husband had a pre-existing relationship with Dominic before 2018, stating that her husband was the child's "[h]alf brother." She testified that she had not encouraged Dominic to call her and her husband "mom and dad," but stated that was something that he chose to do. Ms. Griffin testified that Dominic was doing "exceptionally well" and stated that he had made "tremendous progress in school." She further stated that Dominic referred to his foster siblings as his "brothers and sisters."

Following the conclusion of the trial, the Juvenile Court entered an order terminating Mother's parental rights. With regards to grounds for termination, the Juvenile Court concluded that Mother had abandoned Dominic through her failure to establish a suitable home, that the conditions that led to Dominic's removal continued to persist, and that Mother had failed to manifest an ability and willingness to assume custody of Dominic.[7] The Juvenile Court further determined that the termination of Mother's parental

---

[6] Mother claimed that had not been anybody's fault but stated it was "just because of everything that's going on," presumably a reference to the COVID-19 pandemic.

[7] Unaddressed by the Juvenile Court in its order was the Department's pleaded assertion that Mother was in substantial noncompliance with the permanency plans. This ground apparently has been abandoned by the Department, as no reference to it is included in the Department's appellate briefing.

rights was in Dominic's best interest.  This appeal followed.

## STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions."  *In re M.L.P.*, 228 S.W.3d 139, 142 (Tenn. Ct. App. 2007).  "Although this right is fundamental and superior to claims of other persons and the government, it is not absolute."  *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007).  "It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination."  *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).  In Tennessee, "[w]ell-defined circumstances exist under which a parent's rights may be terminated."  *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015).  Pursuant to the Tennessee Code, parties who have standing to seek the termination of a parent's parental rights must prove two things.  They must first prove at least one of the statutory grounds for termination.  *In re J.C.D.*, 254 S.W.3d at 438 (citing Tenn. Code Ann. § 36-1-113(c)(1)).  Then, they must prove that termination of parental rights is in the child's best interests.  *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)).

Because the decision to terminate a parent's parental rights has "profound consequences," trial courts must apply a higher standard of proof in deciding termination cases.  *In re M.L.P.*, 228 S.W.3d at 143.  "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest."  *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)).  "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth."  *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007).  This heightened burden of proof "minimizes the risk of erroneous decisions."  *In re M.L.P.*, 228 S.W.3d at 143.

Due to the heightened burden of proof required under the statute, we must adapt our customary standard of review.  *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).  "First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d)."  *In re M.J.B.*, 140 S.W.3d at 654.  "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights."  *Id.*

---

According to the Juvenile Court's *oral* ruling following the proof at trial, the Juvenile Court did not find the ground to be sufficiently established.

**DISCUSSION**

In her brief on appeal, Mother challenges the grounds for termination found by the Juvenile Court and the court's ruling that termination of her parental rights was in the best interest of the child. Of course, by mandate of the Tennessee Supreme Court, our review on appeal would ordinarily reach these matters regardless of whether Mother had specifically raised them. In order to help "ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures," we are required to review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

*Failure to Establish a Suitable Home*

In its termination order, the Juvenile Court found, by clear and convincing evidence, that Mother abandoned Dominic through her failure to provide a suitable home. This particular ground of abandonment authorizes the termination of parental rights when:

> (ii)(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child,[8] and the child was placed in the custody of the department or a licensed child-placing agency;
> (*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
> (*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made

---

[8] Whereas the statute now clearly ties this ground to an order of removal entered "at any stage of proceedings *in which a petition has been filed* in the juvenile court *alleging* that a child is a dependent and neglected child," Tenn. Code Ann. § 36-1-102(1)(A)(ii) (emphases added), the statute previously read to require that the child be removed "as the result of a petition filed in the juvenile court in which the child *was found* to be a dependent and neglected child." *See In re Kaden W.*, No. E2018-00983-COA-R3-PT, 2019 WL 2093317, at *6 (Tenn. Ct. App. May 13, 2019) (emphasis added) (quoting Tenn. Code Ann. § 36-1-102(1)(A)(ii)(2017)).

reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

We agree that this ground has been clearly and convincingly established. First, the proof clearly shows that Dominic was removed from Mother by the entry of a court order in October 2018. That order followed the filing of a petition by the Department in the Juvenile Court seeking to have Dominic declared dependent and neglected, and the order indicated that Dominic was placed in the custody of the Department. Second, the order of removal contained a finding that reasonable efforts had been made to prevent Dominic's removal from the home.[9]

As to the last element, whether the Department made reasonable efforts to assist Mother in establishing a suitable home for a period of four months following Dominic's removal and whether Mother made reciprocal efforts to establish same, we note that the Department's efforts are deemed reasonable under the statute if its efforts "equal or exceed the efforts of the parent . . . toward the same goal." *Id.* It also should be noted that the concept of a suitable home encompasses more than a proper physical location. *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016). Specifically, the establishment of a suitable home entails considerations as to whether "[a]ppropriate care and attention" are given to the child at issue. *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016). Here, the Juvenile Court found that, in the more than twenty months since Dominic's removal, the Department had attempted assistance by "providing referrals for mental health assessments, provid[ing] housing resources, provid[ing] parenting education resources, and provid[ing] ongoing case management." In juxtaposition to the Department's efforts to engage Mother, the Juvenile Court found that Mother had "failed to provide a suitable home for the child" and had been terminated from service providers, failed to follow recommendations for mental health treatment, and resided in various facilities for a year that do not allow children to reside. The Juvenile Court stated that Mother had not done anything to improve her circumstances and concluded that her lack of effort signaled that she would not be able to provide a

---

[9] As to this issue, we note that the record evidences that the Department became involved with the family several months before Dominic's removal, during which time the Department, among other things, assisted with locating resources to pay for electricity in the home and made multiple attempts to schedule home visits.

suitable home for Dominic in the near future.

There is no question here that Mother had failed to establish a suitable home by the time of trial. Mother openly acknowledged that Dominic could not stay where she resided. One of her prior residences, where she stayed in the immediate wake of Dominic's removal, had also been lacking. As previously noted, Ms. West testified that Mother's housing at Autumn Landing did not have power "for the majority of the time," and Mother had been evicted from that housing due to housekeeping issues.

In her briefing, Mother complains of the Department's efforts to assist her, a point she also attempted to establish at trial. As previously detailed, when Mother was asked during her testimony if the Department had given her information after Dominic's removal about "where to find providers, where to find housing, et cetera," Mother stated the Department had not. Of course, Ms. West testified that she had given Mother a resource guide in November 2018 and that Mother had no questions about it. The Juvenile Court's findings reveal that it accredited the Department's witness on this issue, and evidence in the record reveals that the Department also developed permanency plans for Mother that included responsibilities related to remedying the conditions that had necessitated foster care, provided bus passes, referred Mother for parenting instruction, supervised visitation, offered to put in a referral for mental health services and medication management, and offered to complete a budget form, among other efforts.

Evidence in the record further shows that the Department attempted to schedule home visits on several occasions but had been unsuccessful. According to a progress report, Mother would ask a Department worker to come out but then would either not be home or would ask to move the visit to another day. Whereas Mother's housing at Autumn Landing usually lacked electricity, the Department not only had given Mother a resource guide, but it also specifically provided Mother with contact information for an employment agency.

In addition to losing her housing at Autumn Landing and eventually obtaining residence at KARM, where Dominic could not stay, Mother continued to neglect her mental health. This was a key issue in this case. Again, a suitable home requires much more than an appropriate physical structure. *In re Navada N.*, 498 S.W.3d at 595. Although Mother completed a mental health assessment, she never completed a psychiatric evaluation as required.[10] Testimony from a Department worker indicated that Mother had been given a list of providers, and when Mother informed the Department she had insurance, Mother had been informed how to call her insurer to request a list of providers. Obviously, Mother's failure to complete a psychiatric evaluation was a concern in this case

---

[10] One of Mother's permanency plan requirements was to follow treatment recommendations from her mental health assessment. Submitting to a psychiatric evaluation was among Mother's treatment recommendations from her mental health assessment in this case.

- 10 -

given Mother's mental health history and the fact that it had been specifically required as one of her treatment recommendations. Although she claimed to be compliant with her medication at trial, the proof showed that Mother had been noncompliant during a period in the case, contributing at that time to a termination of services. Further, although Mother also claimed to be in therapy, Ms. West was not aware that Mother had ever attended therapy and Ms. Griffin was not aware of Mother ever completing therapy.

Notwithstanding Mother's testimony at trial that the Department had not given her resource information, the Juvenile Court accredited the testimony of the Department's witness on this point, and the evidence clearly showed that Mother had failed to establish suitable housing despite the Department's various efforts at assistance, both in the immediate wake of Dominic's removal but also across the entire pendency of the case. We further conclude that there was clear and convincing evidence for the Juvenile Court to find that Mother would not be able to provide a suitable home for Dominic in the near future, and given all of the above, we hereby affirm its reliance on this ground for termination.

*Persistence of Conditions*

The termination ground commonly known as "persistence of conditions" applies when

> [t]he child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child,[11] and:
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

---

[11] Although this ground was previously only applicable if a juvenile court had adjudicated the child to be dependent and neglected, *see In re Jude M.*, No. E2020-00463-COA-R3-PT, 2020 WL 6233742, at *11 n.4 (Tenn. Ct. App. Oct. 22, 2020), the current version of the statute, as noted herein, contains a threshold requirement that the ground be predicated upon an order removing the child which was "entered at any stage of proceedings in which a petition has been filed in the juvenile court *alleging* that a child is a dependent and neglected child." Tenn. Code Ann. § 36-1-113(g)(3)(A) (emphasis added).

- 11 -

Tenn. Code. Ann. § 36-1-113(g)(3)(A). While the Juvenile Court's order in this case contains limited findings responsive to this ground, notably, it contains no findings relative to (g)(3)(A)(iii) concerning whether "[t]he continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home." Being an element of the statutory ground, it is a factor that must be established and found. Indeed, "[t]he absence of appropriate findings supporting this ground for termination is not a trivial concern." *In re Mickeal Z.*, No. E2018-01069-COA-R3-PT, 2019 WL 337038, at *13 (Tenn. Ct. App. Jan. 25, 2019). In termination cases, "the trial court is specifically directed by statute to 'enter an order that makes specific findings of fact and conclusions of law.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(k)). Because the Juvenile Court did not make findings regarding each of the elements applicable to the persistence of conditions ground, we hereby vacate the termination order with respect to this ground.[12]

*Failure to Manifest an Ability and Willingness to Personally Assume Custody or Financial Responsibility of the Child*

This ground for termination, which the Juvenile Court held was established, applies under the following circumstances:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, **and placing the child in the person's legal and physical custody would pose a risk of substantial harm** to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14) (emphases added). Similar to the previous ground for termination, a deficiency exists here with respect to the Juvenile Court's findings. As evident by the language emphasized above, a finding that placing the child in the parent's custody would pose a risk of substantial harm to the child is a necessary component of the statutory ground. The Juvenile Court's order in the present case contains no such finding, a fatal point the Department itself calls attention to in its appellate briefing. The Department notes that it does not defend this ground for termination, and given the absence of a requisite finding under the statute, we are compelled to vacate the Juvenile Court's order with respect to the ground. *See In re Nevaeh B.*, No. E2020-00315-COA-R3-PT, 2020 WL 4920020, at *3 (Tenn. Ct. App. Aug. 20, 2020).[13]

---

[12] We do not remand the case for further findings on the matter given our ultimate affirmance herein of the Juvenile Court's termination decision.

[13] Unlike our decision in *In re Nevaeh B.*, we do not remand the case for a particular finding on the "substantial harm" issue here given that this record establishes another ground for termination and, as discussed *infra*, that termination is in the child's best interests. We simply vacate the termination order with respect to this ground.

*Best Interests*

When at least one ground for termination has been properly established against a parent, as it has in this case, we turn our focus to whether termination of the parent's parental rights is in the child's best interests. "Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013). As such, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *Id.* at 572 (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)).

When conducting a best interests analysis, conflicts between the interests of the parent and child are to be resolved in "favor of the rights and best interest of the child." *Id.* at 573 (citing Tenn. Code Ann. § 36-1-101(d)). Importantly, the best interests analysis "must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). In Tennessee, the General Assembly has codified a list of nine non-exclusive factors that trial courts are to consider when conducting a best interests inquiry in termination of parental rights proceedings. These factors are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "Ascertaining a child's best interests does not call for a rote examination" of these factors, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *Moody*, 171 S.W.3d at 194).

In considering the factors under Tennessee Code Annotated section 36-1-113(i), the Juvenile Court supported its conclusion that termination of Mother's rights was in Dominic's best interest by noting that

- Mother had not made a lasting change in her home and circumstances that would allow Dominic to be safely placed in her home.
- Mother had not completed mental health treatment.
- Mother did not have a physical home for the child to return.
- Mother had not made lasting changes in her lifestyle or conduct after reasonable efforts by the Department to help.
- Dominic was bonded to the foster parents.
- The foster parents were willing to adopt Dominic.
- Mother's mental and emotional state would be detrimental to Dominic and prevent her from effectively parenting him.
- Changing caregivers would be determinantal to Dominic.

We agree that there is clear and convincing evidence to support the Juvenile Court's best interest determination. As noted by the Juvenile Court, at the time of the July 2020 trial, Mother did not have a proper home where Dominic could live with her. Nothing had changed in that regard from the time of Dominic's removal in the fall of 2018. Concerns also still surrounded Mother's mental health, as she had never fulfilled all

- 14 -

recommendations stemming from her mental health assessment. In short, a lack of demonstrated progress still plagued the very subject areas that prompted the Department's initial involvement in the case. Life with Mother was simply not an option for Dominic at the time of trial, and Mother candidly admitted at trial that she "can't keep [Dominic] right now." Although Mother no doubt expressed love for Dominic, the evidence at trial did not provide any meaningful foundation to conclude that Mother would be in a position to provide suitable care for Dominic in the near future. It is incumbent upon the court system to look to what is in the child's best interest, and in contrast to the concerns surrounding Mother's circumstances, the evidence at trial revealed that Dominic was doing well with his foster family. He had a pre-existing relationship with his foster family through his foster dad, who was his half-brother, and the proof indicated the foster family wanted to adopt him. Because we conclude that the record provides clear and convincing evidence that termination of Mother's parental rights is in Dominic's best interest, we hereby affirm the Juvenile Court's termination of her rights.

## CONCLUSION

Due to insufficient findings, we vacate the Juvenile Court's reliance on the persistence of conditions ground for termination as well as the ground for termination based on Mother's alleged failure to manifest an ability and willingness to assume custody of Dominic. We affirm, however, the Juvenile Court's conclusion that there is clear and convincing evidence to support both its finding of abandonment and its determination that the termination of Mother's parental rights is in Dominic's best interest.


    s/ Arnold B. Goldin
ARNOLD B. GOLDIN, JUDGE